___

**SO ORDERED,**



**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.
___

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

**IN RE: TERRY FLOYD**                                  **CASE NO: 21-10276-SDM**

**DEBTOR**                                              **CHAPTER 13**

**MEMORANDUM OPINION AND ORDER OVERRULING OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN**

This matter came before the Court on the *Objection to Confirmation of Chapter 13 Plan* (the "Objection")(Dkt. #17) filed by Southern Bancorp Bank ("Southern"). On July 22, 2021, the Court held a telephonic hearing, at which the Chapter 13 Trustee (the "Trustee") and counsel for Southern presented arguments to the Court. At the conclusion of the hearing, the parties were directed to brief the legal issues raised. The briefing schedule concluded on August 30, 2021. At that point, the Court took the matter under advisement. The Court is now ready to rule.

### I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated

August 6, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and (L) (confirmations of plans).

## II. FACTS AND PROCEDURAL HISTORY

The facts surrounding this matter are largely undisputed by both parties. The Debtor, Terry Floyd ("Floyd"), filed for voluntary bankruptcy relief under Chapter 13 on February 10, 2021. Floyd's petition indicates a monthly income in the amount of $2,259.66 and monthly expenses in the amount of $2,157.00, resulting in a net monthly income of $102.66. Among the unsecured creditors listed in Schedule E/F, Southern is scheduled as holding two nonpriority unsecured claims: one in the amount of $15,436 and another in the amount of $3,737. According to Floyd's schedules, including the alleged unsecured claims held by Southern, the total amount of all unsecured claims is $40,465.25. On March 8, 2021, Floyd filed a proposed Chapter 13 plan (the "Chapter 13 Plan") indicating a Chapter 13 Plan period of 60 months consisting of weekly payments to the Trustee in the amount of $24.00. The Chapter 13 Plan provides for payment of $0.00 to nonpriority unsecured creditors on allowed unsecured claims and does not include a separate provision regarding payments made to the Trustee to be distributed to Southern.

On March 16, 2021, Southern filed a single proof of claim (POC #3-1) indicating a total claim in the amount of $23,800.14 consisting of two separate accounts, one of which is secured by a lien on three items of collateral: (1) a 2005 Tracker Marine 700LX boat; (2) a 2005 Mercury Outboard Motor 90ELPTP; and (3) a 2004 Tractor Nitro 700 boat trailer (the "Boat Claim"). According to the "Account Detail" attached to the proof of claim at page 4 of 10, the amount remaining to be paid on this claim is $3,765.42[1]. On the same day, Southern filed the Objection to

---

[1] The same "Account Detail" on page 5 of 10 refers to a second account with a balance of $15,499.84. The collateral referenced in this second account is real property. The Court notes that this real property was foreclosed under Southern's note and deed of trust prior to Floyd's

confirmation of Floyd's Chapter 13 Plan, arguing that the Chapter 13 Plan made no provision for the payment of Southern's secured claim, and that Southern should be paid on its fully secured claim plus all expenses incurred. (Dkt. #17). A hearing on the Objection was set to be held on May 13, 2021; however, on May 12, 2021, the matter was reported as settled, and the Agreed Order was to be entered into by the parties and submitted to the Court for consideration.

Later, on June 10, 2021, Southern submitted a *Request for Reset of Hearing*, indicating that the parties failed to resolve the Objection. The Court then rescheduled the hearing to July 22, 2021. The Court heard oral arguments from the Trustee and Southern; neither Floyd nor Floyd's counsel participated in the hearing. At the hearing, Southern informed the Court that Floyd sold, prepetition, the collateral securing Southern's claim without Southern's consent and that, because of the unauthorized sale, the claim should be treated as nondischargeable[2] and paid through the Chapter 13 Plan as a secured claim. Specifically, the Agreed Order prepared by Southern, and agreed to by Floyd, proposes to pay Southern's claim of $3,796.75 plus 5.25% interest as a "special

---

bankruptcy filing; however, Southern filed a *Motion to Lift the Automatic Stay* (Dkt. #40) and subsequently entered into an *Agreed Order Lifting the Automatic Stay* (Dkt. #42) to allow it to correct a potential foreclosure deficiency. Southern's claim also includes attorney's fees in the amount of $2,885.00 and expenses in the amount of $1,649.88. The Court is unsure about the exact amount of attorney's fees and expenses assessed to each of the two accounts from the proof of claim. The Court infers, however, from the "Account Detail" attached to the proof of claim, as well as from the proposed agreed order (the "Agreed Order") negotiated between Southern and Floyd as proposed and presented to the Trustee for resolution of Southern's Objection, that the amount at issue for the purposes of this Objection and Opinion is $3,765.42 and is being claimed by Southern, through POC #3-1, as an allowed fully secured claim.

[2] At this time, the Court declines to make a determination of whether the claim at issue is nondischargeable under the Bankruptcy Code. The parties may still, under Bankruptcy Rule of Procedure 4007(c), file a complaint to determine the dischargeability of Southern's claim. As such, the Court will address in this Opinion whether Southern's claim (regardless of the dischargeability status) may be properly classified separately in a special class apart from all other general unsecured claims.

claim" under 11 U.S.C. § 1322(b)(1)[3] merely because Southern's claim is "non-dischargeable due to the unauthorized disposition" of Southern's collateral. The Trustee disagreed, arguing that, as of the petition date, Floyd did not own the collateral because he sold the collateral, that it was not property of the bankruptcy estate, and the claim is, therefore, unsecured. The Trustee further argued that, while § 1322(b)(1) allows for the designation of a separate class of unsecured claims, the separate classification is only permissible if the designation does not discriminate against the remaining unsecured claims. Thus, according to the Trustee, a label of "nondischargeable" does not permit a separate, special class because that classification would impermissibly discriminate against the remaining unsecured claims.

### III. DISCUSSION

There are two issues presented to this Court. The first issue concerns the secured or unsecured status of Southern's claim because of Floyd's disposition of the collateral and whether the claim should be bifurcated under § 506(a)(1). The second issue is whether the designation of a separate, special class of Southern's claim is unfairly discriminatory and therefore conflicts with § 1322(b)(1). As both issues concern the overall confirmation of Floyd's Chapter 13 Plan, the Court will address both issues separately.

**A.    Southern's Boat Claim is an allowed unsecured claim and is not subject to bifurcation under § 506(a)(1).**

Southern argues that the Boat Claim is a fully secured claim in Floyd's Chapter 13 bankruptcy. Floyd voluntarily sold, however, the collateral securing the Boat Claim prepetition and, at this time, its location and value are unascertainable. As such, an issue arises concerning the status of Southern's claim: when collateral securing a claim is transferred or sold prepetition,

---

[3] Except where stated otherwise, all subsequent statutory references will be to Title 11 of the U.S. Code.

rendering the value to the bankruptcy estate zero or nondeterminable, does the claim remain secured or does it become unsecured in a Chapter 13 bankruptcy case?

The disposition of collateral securing a claim, and the effect of the disposition of that collateral, is governed by the Mississippi Uniform Commercial Code ("UCC"). According to the UCC adopted in Mississippi, "a security interest continues in collateral notwithstanding sale, exchange, or disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds[4] including collections received by the debtor." Miss. Code Ann. § 75-9-306. Based on this statute, the Court recognizes that, under Mississippi law, Southern continues to have a security interest in the collateral securing the Boat Claim, to include, if provided for in Southern's security documents or instruments, in the sales proceeds thereof.[5] But Southern's claim must now be properly classified under the Bankruptcy Code in this bankruptcy case. The Court first turns to § 506(a)(1) of the Bankruptcy Code to determine whether it is applicable in this case:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1). The key consideration under § 506(a)(1) is whether Southern's lien is on "property in which the estate has an interest." If the estate has an interest in the collateral at the

---

[4] There is no evidence before the Court regarding any perfected lien that might be held by Southern with respect to any proceeds of the collateral, the amount of sale proceeds received by Floyd, or the disposition of the sales proceeds prior to the bankruptcy filing. As a result, the Court cannot make a determination as to whether the sales proceeds of the collateral are technically property of the bankruptcy estate.

[5] "Under nonbankruptcy law, a claim is typically considered to be a secured claim if it is secured by collateral of some sort, regardless of the value of the collateral." 4 COLLIER ON BANKRUPTCY ¶ 506.03 (16th ed. 2021).

time of the bankruptcy filing, the claim would be subject to bifurcation under § 506(a)(1)—it would be treated as "a secured claim to the extent of the value of such creditor's interest in such property . . . and an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). In this case, Southern's collateral was sold by Floyd prior to the bankruptcy filing, thereby divesting Floyd of ownership and possession of the collateral prior to entry of the order of relief. The bankruptcy estate, therefore, has no interest in the property securing Southern's claim and results in Southern's claim being classified as an allowed unsecured claim.

Other courts addressing this issue have found that both the voluntary and involuntary prepetition disposition of collateral securing a claim results in the claim being treated as an allowed unsecured claim. *See In re Elliott*, 64 B.R. 429 (Bankr. W.D. Mo. 1986); *In re Gabor*, 155 B.R. 391 (Bankr. N.D. W. Va. 1993); *In re Garrison*, 95 B.R. 461 (Bankr. E.D. Ky. 1988). In *Elliott*, the debtor and her former fiancé purchased engagement rings from the creditor and executed an installment contract to finance the purchase. *Elliott*, 64 B.R. at 430. Following this purchase, but before the debtor filed for Chapter 13 bankruptcy, her fiancé disappeared and took the engagement rings without the debtor's permission. *Id*. The debtor had no idea of the abandoning fiancé's whereabouts. *Id*. The issues presented to the *Elliot* court were whether the creditor had a secured claim for the collateral misappropriated before bankruptcy by a codebtor on a contract and, if so, the value of the secured claim. *Id*.

Much like this Court, the *Elliott* court found that the security interest in the rings survived despite their disposition by consulting the Kansas Uniform Commercial Code 84-9-306(2)—a provision that is identical to the provision of the Mississippi UCC concerning the disposition of collateral securing a claim. The court ultimately held, however, that the creditor did not have a

secured claim in the Chapter 13 case, stating that, "[b]y definition, 'secured claim' requires the availability of collateral to secure the creditor's right to payment." *Id*. The court went on to address the valuation of the claim under § 506(a), stating "even if [the creditor] had a secured claim, as a practical matter the valuation of the claim produces the same result." *Id*. at 431. Because the rings went missing prepetition and the debtor could not obtain possession of them, the rings were the "same as destroyed or stolen property" and, therefore, the estate's interest in the rings is of no value. *Id*. The secured portion of the claim would thus "be valued at zero and the remainder, i.e., the entire allowed claim, would be payable as an unsecured claim." *Id*. Ultimately, the *Elliott* court held that the creditor's claim regarding the misappropriated engagement rings was payable as an allowed unsecured claim in the Chapter 13 bankruptcy. *Id*.

This Court agrees with the holding of *Elliott* and cases following its holding that, although the security *interest* in the collateral securing the Boat Claim survives under Miss. Code Ann. § 75-9-306, the sale of Southern's collateral securing the Boat Claim results in the collateral not being "property in which the estate has an interest" and renders the Boat Claim an allowed unsecured claim.[6]

---

[6] The Court notes that the facts presented here are somewhat different than those presented in *Elliott*, namely that, in *Elliott*, the ownership interest in the engagement rings remained with the debtor despite the rings taken by the debtor's ex-fiancé. Here, Floyd's sale of the collateral was a transfer of his ownership interest to someone else. Had the facts in this case been analogous to those presented in *Elliott*, i.e., that the collateral for the Boat Claim was merely missing and Floyd retained an ownership interest in the collateral, the Court would not likely have agreed with the *Elliott* court's finding as to the secured versus unsecured status of the claim. Put in another way, if Floyd would have retained an ownership interest in the collateral, the Court would likely find that the Boat claim is undersecured and subject to bifurcation under § 506(a)(1). Even so, the ultimate or practical result would be the same: the Boat Claim would be bifurcated to reflect $0.00 as the allowed secured portion of the claim and $3,765.42 as the allowed unsecured claim, causing the entirety of Southern's claim to be payable and treated as all other unsecured claims.

**B.**  **The treatment of Southern's unsecured claim as proposed in the Agreed Order is unfairly discriminatory under § 1322(b)(1).**

The Court must next determine whether § 1322(b)(1) allows or prevents the separate classification of Southern's unsecured claim from the other unsecured claims scheduled in Floyd's proposed Chapter 13 Plan. Section 1322 (b)(1) provides that a plan may designate a class or classes of unsecured claims, provided that such classification complies with § 1122[7], unless such a classification "discriminates unfairly against any class so designated." 11 U.S.C. 1322(b)(1). The separation of unsecured claims allowed by § 1322(b)(1), therefore, presumes and allows for discrimination upon the separate classification of such claims, but affirmatively prohibits any discrimination that is "unfair." *In re Bennett*, 615 B.R. 384, 394 (Bankr. N.D.N.Y. 2020).

As is the case with most modifying terms found within the Bankruptcy Code, the Bankruptcy Code itself does not define what is meant by "unfair" in the context of § 1322(b)(1). As a result, courts have developed several multi-factored tests analyzing the unfairness standard on a case-by-case basis. The range of analyses in determining what is "unfair" under § 1322(b)(1) has resulted in no definitive answer and, thus, many different results. One court has observed that decisions on this issue "ran the gamut from everything goes to nothing is allowed," stating that "somewhere between total whim and Act of God lies the answer to what justification is needed to hew out a particular class of unsecured creditors and distinguish it from other unsecured creditors." *In re Hill*, 4 B.R. 694, 697-98 (Bankr. D. Kan. 1980).

While some courts have enunciated lists of factors that aid in determining the issue of unfair discrimination under § 1322(b)(1), other courts have criticized the use of such tests that rely on

---

[7] Section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

the "undefined notions of 'reasonableness,' 'legitimacy,' and 'good faith'" in making such a determination. *Compare In re Bentley*, 266 B.R. 229, 238 fn. 14 (B.A.P. 1st Cir. 2001) (declining to utilize factors and instead choosing to look at the principles and structure of Chapter 13 for a baseline against which to evaluate discriminatory provisions for fairness) *with In re Leser*, 939 F.2d 669, 672 (8th Cir. 1991) (Enunciating a four-prong test: (1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out the plan without discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis for such discrimination) *and In re Gregg*, 179 B.R. 828, (Bankr. E.D. Tex. 1995) (utilizing four factors: (1) whether the discrimination has a reasonable basis; (2) whether the classification is necessary to the debtor's rehabilitation under Chapter 13; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the class discriminated against and whether the degree of differential treatment is directly related to the basis for the discrimination demand).

The *Bentley* court, in acknowledging and adopting the criticisms of the factors used in *Leser*, opted to utilize a "baseline" approach, which is to "look to Chapter 13 itself for what is normative, the baseline from which departures can be discerned, measured, and evaluated for fairness." *Id*. at 239. In *Bentley*, the debtors filed a Chapter 13 plan that divided nonpriority unsecured creditors into two classes: one containing creditors holding student loan obligations in the amount of $57,727.95 that would be excepted from discharge under §1328(a)(2) and paid in full over the life of the plan; and the second consisting of all other unsecured claims in the amount of $55,000 that would be paid a total of $2,000 to be shared on a *pro rata* basis. *Id*. at 232. The Chapter 13 trustee objected to the plan because it unfairly discriminated against the class of general unsecured creditors under §1322(b)(1). By rejecting the *Leser* factors and looking instead to the

structure of Chapter 13 generally, the First Circuit identified four "guiding provisions and principles" that were the most relevant in making a determination of unfair discrimination under § 1322(b)(1): (1) equality of distribution; (2) the nonpriority of student loans; (3) whether contributions to dischargeable and nondischargeable debts are mandatory or optional; and (4) affording the debtor a fresh start under Chapter 13 of the Bankruptcy Code. *Id*. at 240-43. In doing so, the court drew a line between fair and unfair discrimination:

> [w]hen a plan prescribes different treatment for two classes but, despite the differences, offers to each class benefits and burdens that are equivalent to those it would receive at the baseline, then the discrimination is fair. On the other hand, when the discrimination alters the allocation of benefits and burdens to the detriment of one class, the discrimination is unfair and prohibited.

*Id*. at 240. In applying these principles of the Bankruptcy Code to the proposed plan, the *Bentley* court ultimately ruled that, by assuming the unsecured creditor's share for the debtors' benefit without any compensation to the unsecured creditors of an equivalent value, the plan unfairly discriminated against the second class of unsecured creditors. *Id*. at 243.

There is currently no direct precedent from the Fifth Circuit providing clarity on this issue; however, in analyzing the unfair discrimination standard in §1322(b)(1) in the context of giving priority to a cosigned debt over all other unsecured claims, the Fifth Circuit has stated that such differential treatment "is not discriminatory if [it] rationally further[s] a legitimate interest of the debtor and [does] not disproportionately benefit the cosigner." *In re Chacon*, 202 F.3d 725, 726 (5th Cir. 1999). Despite the lack of direct guidance from the Fifth Circuit, other bankruptcy courts in the Northern District of Mississippi, on two occasions, examined the issue of unfair discrimination of separate classification, albeit in the context of nondischargeable student loans, in *In re Boscaccy*, 442 B.R. 501 (Bankr. N.D. Miss. 2010) (Opinion of Houston, J.) and more recently in *In re Lush*, 544 B.R. 575 (Bankr. N.D. Miss. 2015) (Opinion of Olack, J.).

In *Boscaccy*, the trustee objected to Chapter 13 confirmation on the basis that the proposed separate classification of an unsecured student loan debt from the claims of other general unsecured debts caused the student loan debt to be treated more favorably in violation of § 1322(b)(1). 422 B.R. at 505. *Id*. The proposed plan provided for the curing of the existing defaults in the debtors' student loan obligations and maintenance of their future payments under § 1322(b)(5). *Id*. at 504. In addition, over each of the debtors' respective plans, the student loan obligations would be brought current, therefore necessitating greater payments to the student loan creditors than the payments proposed to the general unsecured creditor classes. *Id*.

The *Boscaccy* court began by making note of the several-factor tests followed by varying courts, ultimately choosing to follow the analysis set out in *In re Harding*, 423 B.R. 568 (Bankr. S.D. Fla. 2010), which considered (1) the debtor's fresh start; (2) the clear legislative objective of student loan repayment; and (3) fair treatment of creditors as a whole. *Id*. at 507. Further, the court took special note of the nondischargeable nature of student loans in both the Chapter 7 and Chapter 13 contexts, observing that, while nondischargeability must be taken into account in the overall fairness analysis, the "general consensus of opinions across the country" is that, "to the extent that a debtor's proposed separate classification of student loan debt from other unsecured debts is put forward on the basis that the student loan debt is non-dischargeable, that basis for differing treatment constitutes unfair discrimination within the meaning of section 1322(b)(1) of the Bankruptcy Code." *Id*. at 507, 510 (quoting *In re Chandler*, 210 B.R. 898 (Bankr. D.N.H. 1997).

The court ultimately found that one plan—the Nunnally plan—was unfairly discriminatory. *Id*. at 512. Specifically, the court noted that if the proposed payments for the student loan creditor in the Nunnally case were allocated to all unsecured creditors, including the student loan creditor, each would receive an 80% distribution. *Id*. Conversely, if all creditors were

treated equally, the student loan payment would only be reduced to 20%, while the distribution to the general unsecured creditors would be increased by 80%. *Id*. In so finding, the court stated that, if the debtor in the Nunnally case wished to achieve Chapter 13 plan confirmation, he "must agree to pay the student loan creditor and the general unsecured creditors on an equal basis." *Id*.

The *Lush* court similarly analyzed the issue of unfair discrimination in the student loan context and held that the arbitrary treatment of one unsecured creditor's debt based on its non-dischargeable nature was itself discriminatory treatment. 544 B.R. 575, 584. Following the confirmation of the debtor's Chapter 13 plan and subsequent filing of an amended Schedule B (disclosing her acquisition of a money market account), the trustee in *Lush* filed a motion to modify informing the court that the debtor had inherited $51,926.00. *Id*. at 578. The trustee asked the court to require the debtor to withdraw the inherited funds from the money market account for distribution to unsecured creditors that timely filed proofs of claim. *Id*. The parties then submitted an agreed order to the court providing that the debtor would remit $26,000 to the trustee for distribution to the unsecured creditors, except for Sallie Mae, Inc., a student loan creditor. *Id*. The agreed order further provided that the debtor would pay Sallie Mae, Inc. directly and that the student loan would not be subject to discharge. *Id*. at 579. In other words, the parties effectively proposed to remove Sallie Mae, Inc. from the Chapter 13 plan. *Id*. Following a determination that the debtor was bound to the agreed order under Mississippi contract law, the court nevertheless determined that the agreed order should not be approved since it unfairly discriminated against Sallie Mae, Inc. *Id*. at 581.

Although the court in *Lush* noted that it previously held that discrimination based solely on nondischargeability of a claim is generally considered to be unfair, "there is no provision in the Code that defines the parameters of fairness in the context of nondischargeable debts." *Id*. (citing

*In re Cooper*, No. 11-52095-KMS, slip op. at 7 (Bankr. S. D. Miss. Aug. 3, 2012) (Opinion of Olack, J.). In relying on Fifth Circuit precedent analyzing the issue of discrimination in the context of cosigned consumer debt, and recognizing that the Fifth Circuit will "scrutinize disproportionate treatment of unsecured claims to determine whether there is unfair discrimination," the court held that "a plan cannot arbitrarily discriminate between classes of unsecured creditors, which is exactly what [d]ebtor is attempting to do." *Id*. at 582, 584 (citing *In re Chacon*, 202 F.3d 725, 726-27 (5th Cir. 1999); *In re Ramirez*, 204 F.3d 595 (5th Cir. 2000)).

A similar result occurred outside of the Fifth Circuit in *In re Osorio*, a case in which a Chapter 13 plan was filed proposing to separately classify unsecured dischargeable[8] municipal court fines in full but offer a 0% distribution to the remaining unsecured creditors. 522 B.R. 70, 73 (Bankr. D.N.J. 2014). The Chapter 13 trustee filed objections to confirmation of the debtors' plan, arguing that such treatment is an unfair discrimination between the classes of unsecured claims. *Id*. Like other courts considering the meaning of unfair discrimination, the court in *Osario* similarly considered the lists of factors considered by previous courts and "chose to apply different factors from the several non-exclusive lists courts have developed" in determining whether there was a reasonable basis for discrimination under the debtors' plans. *Id*. at 77. The factors specific to the claims of the debtors included (1) the threat of incarceration for failure to separately classify the municipal court fines; (2) the extent of the discrimination; (3) the interplay between

---

[8] The Trustee argues in its brief that the issue of separate classification of unsecured claims under 11 U.S.C. §1322(b)(1) "requires an assumption that the Claim is in fact nondischargable." Trustee's Br. at 6. While the determination of discrimination based on nondischargeability is a relevant issue in certain contexts, as discussed in *Boscaccy* and *Lush*, whether a claim is or is not dischargeable does not preclude determination of whether such claim may be separately classified under § 1322(b)(1). *See In re Dziedzic*, 9 B.R. 424 (Bankr. S.D. Tex. 1981) (determining separate classification of nondischargeable claims). The determinative issue is whether such a classification of claims is unfairly discriminatory.

§ 1322(b)(1) and § 1325(b)(1)(B); and (4) the ability to discriminate. *Id*. at 77-83. Although the *Osario* court found no single factor dispositive, the court placed great weight on the extent of the discrimination, stating that it was "entirely unacceptable and unfair" to propose to pay the municipal court fines in full "and absolutely *nothing* to the remaining general unsecured creditors." *Id*. at 80. "Such a disparity, on its face, constitutes unfair discrimination." *Id*. (citing *Boscaccy*, 442 B.R. at 512). The disparate treatment of the unsecured creditors in separating the claims into separate classes would have resulted in the payment of one class 100% while paying the other class 0%, a result that the court held to be "patently unfair." *Id*.

At this juncture, the Court declines to determine the dischargeability status of Southern's claim. But the Court finds that the aforementioned factors and considerations in cases concerning both dischargeable and nondischargeable debts instructive in determining the discriminatory status of the proposed modification contained in the Agreed Order at issue here. It is apparent to this Court that, while certain factors carry more weight depending upon the case that is presented, the most common denominators in making a fairness determination under § 1322(b)(1) are (1) the extent and proportion of the discrimination between the classes that would result upon separation, and (2) the underlying reasons for the discrimination and whether they are reasonable. While other factors are taken into account when determining fairness (e.g., providing the debtor with a "fresh start," the interests of the debtor and creditors, and whether the discrimination has been proposed in good faith), their presence is not always outcome determinative. Even when present, these are often outweighed by the ambiguous and disproportionate treatment of dischargeable or nondischargeable unsecured debts. As such, the Court, for the purposes of this case, adopts these two factors to determine whether the proposed separate classification here is unfairly discriminatory to other scheduled unsecured claims.

Here, the amendment proposed by Southern and Floyd would result in Southern's $3,765.42 unsecured claim being separated from the other scheduled unsecured claims totaling $36,699.83. This would cause the deficiency claim of Southern to be paid $3,765.42 over the life of the Chapter 13 plan and, ultimately, paid in full, while the other unsecured claims will be paid on a *pro rata* basis at 0% and likely discharged once the Chapter 13 plan is completed. On the other hand, absent separate classification, all unsecured debt (including Southern's) would be treated equally. The proportionality of Southern's proposed discrimination is, therefore, one of 100% and 0%, with Southern being paid in full and the other unsecured claims receiving nothing.

Much like the proposed plans and modifications presented in the *Osario* and *Boscaccy* cases (where the splits were 100/0 and 80/20, respectively), such a disparate treatment between Southern's claim and the other scheduled unsecured claims is, on its face, unfair. In addition, aside from Southern's contentions that separate classification will provide Floyd a "fresh start," and that Floyd made an unauthorized sale of the collateral at the root of the Boat Claim, no other reason has been given from Southern or Floyd as to the purpose or benefit of the proposed discrimination. The Court acknowledges the "interests of a debtor" and providing a debtor with a "fresh start" are factors[9] that are relevant in determining unfair discrimination, but those interests do not outweigh the grossly disproportionate treatment of the other scheduled unsecured debts in the Agreed Order.

---

[9] The Court understands Southern's position that if the Boat Claim is not paid in full over the life of the Chapter 13 Plan, and then Southern is successful in obtaining a nondischargeable judgment in any adversary proceeding, the Debtor would not receive the full benefits of a "fresh start". The Court is not, however, making any dischargeability determinations in this Order and Opinion, and the status of the Boat Claim as it currently stands is unsecured with no priority status. Further, an unsecured claim adjudicated to be nondischargeable does not become a priority unsecured claim, it is simply still an unsecured claim of a creditor with no greater rights than any other unsecured creditor holding a general nonpriority unsecured claim. In other words, there are a multitude of ways the debtor can receive the benefits of a "fresh start".

Further, insisting upon separate classification because of the unauthorized sale of the collateral seems more like a method of repentance that Southern demands from Floyd. But forcing an entire innocent class of creditors to repent for the sins of the Debtor by standing to receive nothing (while Southern receives everything) is unfair. While the Agreed Order amending the Chapter 13 plan allows Southern to receive the balance of its claim, the Court finds that the detrimental treatment of the remaining unsecured claims is unfairly discriminatory.

## IV. CONCLUSION

In conclusion, because Floyd transferred the ownership and possession of the collateral securing the Boat Claim prepetition, and that collateral was not property in which the estate had an interest at the time of filing, i.e., not property of the estate, Southern's Boat Claim shall be treated as an allowed unsecured claim. Further, the proposed terms in the Agreed Order between Floyd and Southern to amend Floyd's Chapter 13 Plan is unfairly discriminatory and clashes with 11 U.S.C. § 1322(b)(1). As such, the Court cannot approve the Agreed Order.[10]

Therefore, it is hereby **ORDERED** that the *Objection to Confirmation of Chapter 13 Plan* (Dkt. #17) is **OVERRULED**.

##END OF ORDER##

---

[10] As an aside, the parties should consider whether any amendment is necessary either to Southern's proof of claim or the Debtor's schedules or the Chapter 13 Plan to deal with the remainder of Southern's claim in light of the potential defective foreclosure highlighted by Southern in its *Motion to Lift Stay* (Dkt. #40) and subsequent *Agreed Order Lifting the Automatic Stay* (Dkt. #42).